and Maurice Greer, and we appreciate the efforts of your firm, of course we appreciate everybody's efforts. Thank you. Our second case for this morning is United States v. Christopher Davis and Maurice Greer. So Mr. Riggins, are you the first one up? I am, Your Honor. May it please the court, Chief Justice Wood, Chief Judge Wood. Your Honor, I'm here today on the sufficiency of the evidence claim on behalf of my clients Maurice Greer. Mr. Greer was charged with a couple Walmart robberies back in the Southern District of Indiana in which not only they alleged that he participated but also his brother, whom is a completely similar in build, shape, size, color, and everything. And so one of the things we're asking the court to come and take strong consideration under these circumstances is that Mr. Greer's brother was the star witness for the government under these circumstances and Mr. Williams came in and blamed his brother for everything. The brother is correct, Your Honor. Daryl Williams. I was just going to say, the thing that concerns me about your position is I just don't see how we could rule in your favor without disregarding the jury's credibility determination of the testimony of Green and Orkman, who say that it's Greer who's the robber, not the Kokomo robbery. He's not involved in the second Indianapolis robbery, but I mean these people may all be difficult people, right, but the juries make those determinations. Yes, Your Honor, I understand that and I think what is concerning here is is that the similarities between the brothers and that's one of the things that we pointed out is that some of the identifications that came out, they were able to identify him, but if you look at his brother and him when it's made in comparison, as cross-examined, when I cross-examined one of the witnesses who was involved in this, he pointed out, Townsdale, that the two of them are very similar in color, shape, size, and things of that nature and so . . . The jury knew that, right? The jury knew that they were brothers? Yes, the jury was able to understand that they were paternal brothers and that the jury was also in a position during the If you assume . . . maybe this is a different way of putting Judge Wood's question, but I'll let you react. Assume that the jury credited the testimony of Denise Orkman and Daryl Williams, that they chose to believe the testimony. If that's so, wasn't there enough evidence to convict Davis on counts . . . what is it? Was it three and four related to that August 28th robbery, the second of the three? I think you're referring to Mr. Greer, him being convicted instead of Davis. Davis is the next one. Am I mistaken? Yes, but I'll answer your question anyway. Wasn't Davis convicted on that? He was. Davis was convicted. Yeah. On both of those cases. And didn't Orkman and Williams testify against Davis on that? Yes. With respect to that robbery? Absolutely. Okay, and so if the jury credited their testimony, is that enough in your view as a legal matter? Yeah, I think so, Your Honor. But the thing is, is that . . . But your client is Greer. My client is Greer, as I was pointing out. And Orkman was deathly afraid of Davis and also of Williams. And so, that did not take my client into consideration. And so, what I'm saying is that . . . I understand. . . . that went on behalf of Mr. Williams and pressing himself and pressing his issue before the court put my client in a very bad position. And so, if you remove him from the equation, the question then becomes, would they have made the same conclusion and decided that it got beyond a reasonable doubt under those circumstances? Greer is not part of the August 28th, right? He is, Your Honor. He's part of . . . No, not the August 28th. Yeah, he's . . . Greer is just June 8th and September 14th. That's correct. Yeah, so I'll ask my . . . I apologize for that question. That's not one for you. I think he's going to have problems swinging that bat at that one as well, Your Honor. That's all right. Let him take a shot. You do what you can do. But we do, with respect to Mr. Greer, have Williams and Townsville and Orkman indicating that Greer is involved in the June 8th robbery. And you've got Tom Johnson for the Kokomo who identifies Greer. Yes, Your Honor, we do. Right, okay. And again, as I pointed out to the court, that the similar shape, size, and color. Yeah. Very, very similar. No, I mean, another jury might have come out the other way. We can understand that, but it doesn't mean this jury wasn't entitled to rule as it did. I understand. Mr. Riggins, does . . . in Indiana state courts, in the appellate practice, are Anders briefs allowed? I'm not sure about that in the state court, Your Honor. I've never done any appellate work in the Indiana state court. Okay. In the federal court, though, I have done Anders briefs in the past, and it is very difficult. Just wasn't sure how things worked in the state courts. Thank you. Yes. If you'd like to save a second, your time is waning, so . . . I don't need to save any rebuttal time, Your Honor. All right. I appreciate it. Mr. Garcia, I think you know what your first question is, Mr. Garcia. I'll try and swing that back. All right. On behalf of Christopher Davis, we do not believe there is sufficient element of actual or threatened violence in this case with regard to the August 28, 2015 robbery. And that's because, of course, according to Mr. Williams, the armed robber, Ms. Orkman, was in on it. We know from the facts of the case this was the second robbery, second armed robbery, that Ms. Orkman was involved in. And Ms. Orkman . . . She testified to the contrary, though, right? I'm sorry? She testified to the contrary. Well, what she testified to, I believe, according to the timeline, is that they got together initially and decided that they were going to figure out how to rob the Walmarts. Because, of course, Ms. Orkman was an employee of Walmart, and she was familiar with their security procedures. They did the first one. I understood her testimony on that August 28 to be, look, this just wasn't a show or an act or anything. I actually was in fear when this guy was pointing a gun at me, Williams. I see what you're getting at. So in July of 2015, she goes to the movies, has a conversation with Chris Davis, and she says, hey, look, I really don't want to be a part of this. I think we should talk about forgiveness, et cetera. That's in mid-July of 2015. And then a month and a half later, Davis calls her up on the phone while she's working and says, hey, get ready, he's coming. So was she expecting it on that day to happen? No. Was there any evidence that they had had any further conversation or she had said, look, I am not going to do this? I mean, I think she kind of said, hey, look, I'm feeling uneasy about this. I think we should talk about forgiveness. But, you know, as the government points out on page 22 of its brief, granted, before the robbery, but nonetheless people probably wouldn't forget this, Davis tells her, quote, they will kill you if she decides to talk about what's been going on. Surely people don't just casually disregard that kind of language. And so when she gets the call on the day in question, the August 28th day, she's in a different shift at this point. Why couldn't a jury think that that was the kind of fear? Maybe she's not showing it. Maybe she's afraid of showing it even. Well, not only is she afraid of showing it or not afraid of showing it, but if you look at the totality of the circumstances on that day, he walks up, and according to his testimony, he has to show her the gun to make it look like this is an armed robbery. That's what they had planned. But why does the jury have to think that's all? She knows he has the gun. I mean, I wouldn't – it seems like a lot of people might not feel that comfortable with a gun being brandished in front of them. True, except for the fact this wasn't the first occasion. She knew the robber. She had planned robberies with him, maybe not this specific one on this specific day, but she knew that they were having discussions about robbing this again. No, I get that, and that seems like a perfectly good jury argument to me. But the jury – why did the jury have to accept this characterization? Well, because I think her actions speak louder than her words here. Does she say, yes, I was afraid he might use it against me? Absolutely. I'm not contradicting that. But when you look at her actions, she's so comfortable with him and Williams is so comfortable with her that he sets the gun down, and they proceed to both grab up all of the money. And then what does she do? She says, oh, don't forget, you've got to duct tape me, right? Because that was part of the plan. It wasn't – she was surprised and caught off guard that she was duct taped. They both had to sell this robbery, and prior to it she did nothing other than have that conversation with Mr. Davis about trying to pull out of that conspiracy. She didn't call the police. She didn't quit her job. She didn't tell her managers. She took no steps to remove herself from that conspiracy. And, in fact, if you look at her stipulated factual basis that she signed in her case, she agreed. She was a co-conspirator up and through August 28th of 2015. But I'm not aware of any rule that – well, are you arguing that there's a rule that putting someone in fear who is also properly characterized as a co-conspirator is not legally sufficient for the Hobbs Act? Can you repeat that? Is there still force or violence if the person who is the target of that force or violence is a co-conspirator? So here the indictment specifically charged them with actual or threat of violence. They did not charge force. If the threat of violence is against a co-conspirator as opposed to a stranger, is there any difference for Hobbs Act purposes? I think there is because I think then that element is lacking. You think as a matter of law you can't frighten or threaten your co-conspirators. It's got to be somebody outside the scope of the conspiracy? Yes. Where is the case that says that? We don't have one. That's what makes this case a little bit unique because we have a co-conspirator, again, who has signed facts under penalty of perjury, admitted to the district court. She was in on it. She knew ahead of time it was coming or the possibility it was coming. She had been previously robbed before. She knew the robber. William said she knew he was going to have a gun. She helped plan it. I mean if you look at his transcript. When you say she's in on it, you mean you read her testimony as saying I'm completely in on the August 28th, this was all an act on my part? I wouldn't say that it's an act, but certainly that she feigned the threat of actual or threatened violence here. I think when you look at the totality of the picture. Because knowing it's on videotape and the videotape would have had to show something that looks like a robbery? Correct. I mean look at William's testimony under cross-examination by Mr. Riggins. So you guys devised a plan to get the money from Walmart, right. So she helped you rob the store, basically. Did you come in contact with anyone else? Show anyone else the gun? No. There was nobody else there. No one else was threatened. So under this situation, we do not believe that element is there and that Mr. Davis should be acquitted of those two counts. Thank you. All right. Thank you very much. All right. Mr. Babbs. May it please the Court, Eric Babbs for the United States. The evidence of the second robbery was sufficient to show that the defendants made a threat of violence with a gun. Davis has accomplished. But no one but Orkman was threatened though, right? Orkman was the only one who testified that she was threatened. But she also testified that she withdrew from the conspiracy. But you would never count this as withdrawal. I've seen the government argue about how hard it is to withdraw from conspiracies, and I'm telling you this isn't it. You know, you go call the police or you go announce from the rafters that you're withdrawing. She does express discomfort with what the conspiracy is doing. But you guys would never accept this as withdrawal. Well, regardless, Your Honor, the evidence was sufficient to show that Orkman was coerced to comply because of the threats that Davis and Williams made to her. Orkman testified that she called Davis on the phone after the initial discussion about doing a second robbery and that she told Davis very soon after that initial discussion that she did not want to go through any further robberies. And then she testified about another time when she and Davis went to see a movie together, and she told Davis about the movie's message and suggested that they should be honest and should seek forgiveness. And at that point, Davis said, if you tell anyone, they will kill you. A clear use of threats to coerce Orkman. So even if the court's unsure whether this was an actual withdrawal from the conspiracy, clearly if Orkman didn't withdraw, it was only because Davis was threatening her with violence. And the threat of violence continued during the second robbery itself. Williams held the gun in his hand while walking into the cash room behind Orkman. But then he puts it down on the table, as Mr. Garcia points out. I mean, these hilarious pictures of all that money. Well, Williams set the gun down on the counter while gathering up cash, but only for a minute. And the security video shows that that gun was within Williams' reach at all times. After he gathers up cash, he picks up the gun again. With her help, she's helping him stuff it into containers, right? At that point, she testified that she was in fear. She felt she didn't have a choice. She felt that if she resisted, she would be shot by Williams. That fear was entirely reasonable. And what about this conspirator question that I have? Does the Hobbs Act care whether you're coercing or putting in fear a co-conspirator versus somebody who's not inside the ambit of a conspiracy? The Hobbs Act does not make that distinction. The distinction the case law seems to draw is that the fear has to be reasonable. So if the co-conspirator was so closely involved with the other actors that no jury could find that the fear was reasonable, then that might be a different case. Here, nobody testified that Ortman was not afraid. Williams testified that his showing the gun to Ortman was a threat, that he intended it as a threat. Ortman testified that she was afraid. The security video was fully consistent with that testimony, and the jury believed the testimony of Ortman and Williams that this was a true threat. And there's no ID issue for the Kokomo. Sorry, yeah. There's no ID issue with respect to the second Indianapolis Walmart. We know it's Davis, right? It's not possibly somebody else. In the videos, people seem to be all, like, wrapped up in clothes. All three security videos didn't show the individual's faces directly, but were certainly sufficient to corroborate the eyewitness IDs. So as far as the issue of Davis' identity being sufficiently proved, the witnesses testified that Davis was involved in the planning and preparation, as well as the escape from all three robberies. Cash was found in Davis' apartment. And there was plenty of other evidence, including cell phone location evidence and GPS tracking evidence that corroborated Davis' involvement in all three. As to the involvement of Greer in the first robbery and the third robbery, both the robberies, both of those, there was multiple eyewitness identifications, and the jury also saw the security videos, which could help them corroborate the eyewitness identifications. And the jury was also in the best position to judge the argument from the defense that Williams looked similar to Greer because the jury saw Greer at the defense table at the same time as they saw Williams in court. They also saw how Williams looked in the security video during the second robbery because that was not in dispute, and they saw how Greer looked in the security video during the first and third robberies. Well, does that matter? I mean, if the witnesses are saying it's Greer, you know, actually it seems to me that's the moment that's important. The witnesses are saying, I know it was Greer who was involved in the June 8th robbery and the September 14th robbery. I mean, sitting there in the courtroom, I suppose anybody could probably tell the two people apart because they're just quietly sitting there. But the witnesses didn't express any hesitation, did they? No, they did not. For those reasons, if the court has no further questions, we ask that you affirm. All right. Thank you. Mr. Garcia, I think you saved a little time. I just wanted to point out one thing. Counsel said Ms. Sporkman was the only one who testified. Well, I think the record is clear. She was the only employee present. There was no one else. This was sort of the wee hours. This is after she's in the night shift, right? Correct. What time of day exactly? I'm sorry? What time of day was the right? Two in the morning. It was after midnight some time. Yeah, wee hours in the morning. Wee hours. Yeah. Secondly, I don't know that you could have someone other than Ms. Orkman or someone like her who is as closely involved as I kind of reiterated earlier. And if the court would look at her stipulated factual basis, which is under clause 116CR56, it's document number 14, where she admits to being a co-conspirator of the August 28th robbery. For those reasons, again, as I said earlier, we don't believe the necessary element of actual or threatened violence is present here and should be vacated. Thank you. All right. Thank you very much. And we appreciate your assistance, both of you, to the court. Thanks as well to the government. We'll take the case under advisement.